BROCK v. O'DELL.

1. WITNESS—PARTY DECEASED.—Under the issue whether the word "heirs" had been mistakenly omitted from a deed of conveyance, an heir of the grantor, now deceased, may testify in behalf of the grantee as to a conversation between the grantor and the draughtsman of the deed, which led up to its execution.

2. DEED—MISTAKE—EVIDENCE.—Where mistake is alleged in a deed, it may be proved by parol, and by other than the subscribing witnesses, they being dead.

3. WITNESS—PARTY DECEASED—EVIDENCE.—The fact that the witness who related the conversation between the deceased grantor and the draughtsman, took a like deed at the same time, may affect his credibility, but not his competency.

4. CHARGING JURIES—FACTS.—The trial judge properly refused to charge that, assuming the testimony to be true, the omission of the word "heirs" from the deed was done in ignorance of the law, and not from a mistake of law, as the request called for an expression of opinion as to the sufficiency of the testimony.

5. IBID.—REQUEST TO CHARGE.—Error will not be imputed to the trial judge, in refusing to charge a sound principle of law, when combined with metaphysical distinctions between ignorance and mistake of law, the real distinction being aptly explained by simple illustrations.

6. MISTAKE AND IGNORANCE OF LAW.—Where a deed is executed by father to son, and it is clearly shown by testimony, parol or otherwise, that the word "heirs" was omitted through the mistake of the draughtsman, the agreement and intention being to convey a fee, and not because of ignorance of the law that such word is necessary to convey an estate of inheritance, the mistake may be corrected and a fee declared, in action by the heirs of grantor to recover from the heir of the grantee. *Cases reviewed.*

7. APPEAL—NEW QUESTION.—The point here raised, that no relief can be granted, because the deed was voluntary, not considered, no such point having been raised on Circuit.

MR. CHIEF JUSTICE MCIVER, *dissenting*.

Before WALLACE, J., Pickens, September, 1893.

This appeal was heard on May 29, 1894, and in November, was ordered for reargument, which was had on January 9, 1895. It was an action by Caroline Brock and others against W. T. O'Dell and others, commenced April 27, 1892. The deed from Stephen Clayton to Alfred T. Clayton was as follows:

Know all men by these presents, that I, Stephen Clayton, of the State and district aforesaid, for and in consideration of the natural love and affection which I bear to my son, Alfred T. Clayton, of the district and State aforesaid, have given and granted and by these presents do give and grant unto the said Alfred T. Clayton, his executors, administrators, and assigns, nearly all of the tract of land known as the John Dean land,

containing nearly four hundred acres, formerly divided into three tracts. The first was a transfer from John Dean to Stephen Clayton for two hundred acres, for the course and distance of this part, reference being had to the said deed (Dean to Clayton). The second a transfer from Gideon Ellis to Stephen Clayton for nearly one hundred acres, for the course and distance reference being had to the deed (Ellis to Clayton). The third a transfer from Thomas D. Garvin to Stephen Clayton, containing one hundred acres, for the course and distance reference being had to the deed (Garvin to Clayton.) To have and to hold the above described premises unto the said A. T. Clayton, his executors, administrators, and assigns, forever. And I, the said Stephen, for myself, my heirs, executors, and administrators, the said premises unto the said Alfred T. Clayton, his executors, administrators, and assigns, against the claim of me, the said Stephen Clayton, my executors and administrators, and of every other person whomsoever, shall and will warrant and forever defend. In testimony whereof I have hereunto set my hand and seal, this 22d day of August, in the year of our Lord, one thousand eight hundred and fifty-four.

Signed, sealed, and delivered in the presence of G. W. Taylor, John Campbell.     . STEPHEN CLAYTON. [L. S.]

*Messrs. Cothran, Wells, Ansel & Hollingsworth*, for appellants.

*Messrs. J. P. Carey* and *T. C. Robinson*, contra.

April 15, 1895. The opinion of the court was delivered by

MR. JUSTICE POPE. Stephen Clayton conveyed, by deed, four hundred acres of land, situate in Pickens County, in this State, to his son, Alfred T. Clayton. The said Alfred T. Clayton conveyed the said land in fee simple to one William T. O'Dell in 1882, who is now in possession of the same, and thereafter, in 1884, departed this life. The said Stephen Clayton departed this life intestate, on the     day of June, 1879, and his heirs at law, the plaintiffs and all the defendants, except W. T. O'Dell, now seek by this action to recover the possession and thereafter for a partition, according to law, of the said 400 acres of land. The defendant contests their right to recover said lands from him, claiming to hold the same in fee simple. The contention has arisen from the absence in the deed from Stephen Clayton to Alfred Clayton, of the word "heirs." It is admitted that the word "heirs" does not appear in the deed, but the defendant claims to avoid the effect of such omission of

the word "heirs," by showing that it was the intention of both grantor and grantee in said deed, that such word "heirs" should have been inserted, but that through a mistake of the scrivener employed by the parties in preparing the deed, such word was omitted.

The case came on for trial before his honor, Judge Wallace, and a jury at the fall term, 1893, of the Court of Common Pleas for Pickens County, and resulted in a verdict for the defendant, W. T. O'Dell, which ripened into a judgment, after which the heirs at law of Stephen Clayton, deceased, appealed therefrom. And it is the grounds of this appeal we are now to consider. For the purposes of our consideration of them, they may be treated under these heads: *First*. Was it error in the Circuit Judge to allow the witness, W. W. Clayton, to testify as to what passed between Stephen Clayton, grantor, and J. B. Clayton, the scrivener, at the time the former signed the deed to and for Alfred T. Clayton, the grantee? In this form, different phases of difficulty in the admission of this testimony is suggested by the appellants: (a) The deed was introduced and spoke for itself. (b) The witness was heir at law of Stephen Clayton, and not competent, under section 400 of our Code. (c) The testimony of this witness tended to vary and add to a solemn deed. (d) The testimony was not competent as stating the conversation between Stephen Clayton and J. B. Clayton, because such conversation was addressed to the witness as well as J. B. Clayton. (e) The witness ought not to have been allowed to testify, as he held a deed from Stephen Clayton, liable to the same difficulty as existed in that of Stephen to Alfred Clayton.

The testimony of the witness, W. W. Clayton, he being the only witness offered by the defendant, O'Dell, to testify in regard to the alleged mistake of Stephen Clayton, the grantor, and Alfred T. Clayton, the grantee, in the deed around which both sets of claimants here revolve in their contention, is of great importance, for if his testimony is not competent, the defendant, O'Dell, has lost his defence. The crucial test in determining the competency of testimony, under section 400 of the Code, is, was the transaction or communica-

tion one between a person now deceased and the witness? If it was, he is not competent to testify as to such transaction or communication; if it was not, he is competent. The facts brought before Judge Wallace in this connection, and upon which his ruling was sought, were these: Stephen Clayton had placed his four sons, J. B. Clayton, Alfred T. Clayton, W. W. Clayton, and Moses D. Clayton, respectively, in possession of a tract of his (Stephen's) land some four or five years before August the 22d, 1854, and he had given to each of his daughters a slave or slaves after their respective marriages. On the 22d August, 1854, his son, J. B. Clayton, presented a will to Stephen Clayton to sign; whereupon Stephen Clayton, protesting that a will could be set aside by astute lawyers, thereby defeating the intention of the testator, declined to sign such will, declaring that he intended to give his sons his land and his daughters his negro slaves, and directed his son, J. B. Clayton, to write out a deed for his son, Alfred T. Clayton, for the 400 acres of which he was then in possession. The son, J. B. Clayton, wrote out the deed, which Stephen Clayton signed in the presence of G. W. Taylor and John Campbell, both of whom are now dead. On the same occasion, Stephen Clayton signed a deed to the witness, W. W. Clayton, for his land, which is in the same form as that to Alfred T. Clayton.

Now, when it is remembered that, under the testimony here offered, it was J. B. Clayton who produced the will which he requested his father, Stephen Clayton, to sign, and no connection is shown to have existed between J. B. Clayton and W. W. Clayton touching the will, and as the remarks of Stephen Clayton, whereby he gave his reasons for refusing to sign the will, were made to J. B. Clayton in the presence of W. W. Clayton, we cannot see wherein there was any communication or transaction of Stephen with W. W. Clayton that falls under section 400 of the Code.

As to the question involved in the subdivision (a), it is manifest that if it contains sound law, no mistake, fraud, accident, &c., in a deed could ever be corrected, unless some paper writing, contemporaneously made, was exhitited as the basis therefor. Such is not the law. Subdivision (b)

has been disposed of in the preceding remarks.  As to sub-division (c), it may be said that it is unfortunate that the witnesses to the deed are both dead; but it will hardly be contended that the rights of W. T. O'Dell, or any other party, are to be affected by this providential dispensation, in case other testimony in their stead can be supplied.  Stephen Clayton died in 1879, and this action was not commenced until the 27th day of April, 1892, a period of thirteen years, but only eight years after Alfred T. Clayton's death.   While the plaintiffs had a right to bring their action when they did—on the other hand, the defendant is not to be blamed for their delay. Any defences he may have, founded in law and supported by facts, are not to be prejudiced by plaintiff's delay.  No doubt, he would have hailed with delight the information that these two witnesses were both alive, and within reach of his summons for them to testify.

As to subdivision (d), it may be said that our preliminary remarks are an answer thereto.  Lastly, as to subdivision (e), we do not see how the competency of W. W. Clayton is to be tested by the fact that he had a deed from his father, similar in its terms to that of Alfred T. Clayton. Such a fact might go to his *credibility*, but does not affect his competency.   Besides, in this case, the appellants cannot complain as to this deed of W. W. Clayton.   It was introduced in testimony, but his honor ruled that it could not be used to reinforce the deed to Alfred T. Clayton, and no appeal is taken from this rulling.

The remaining grounds of appeal, the 6th, 7th, and 8th, have given us real concern; and we will, in their discussion, take them up *seriatim*, and will reproduce the text of each.

"6th.  Because his honor, the Circuit Judge, erred in refusing to charge the jury the 4th request of the plaintiff, which was as follows: 'Assuming that all the testimony in regard to the execution of the deed from Stephen Clayton to A. T. Clayton, and of the intention of Stephen Clayton, by the deed in question, to convey the fee to A. T. Clayton, is true; the failure to insert the word 'heirs' in the deed, which was absolutely necessary to convey the fee, was done in ignorance

of the law, and was not, as claimed by the defendant, O'Dell, a mistake of law.'" The Circuit Judge, in declining to make this request, used this language: "Now I cannot charge you that this is ignorance of law; but whether the testimony makes it out, you must say."

We have frequently held that the charge of the Circuit Judge should be construed as a whole. In his charge to the jury in this cause, he had, in a previous part of his charge, said: "The allegations of the plaintiffs is that it (the title) did not pass out of Stephen Clayton by that deed, but that Alfred Clayton had a life estate in it, and at his death it reverted to Stephen Clayton. It is contended by defendants that Stephen Clayton intended that that deed should operate as if the word 'heirs' was there, and that that was the understanding of the parties, and that by a mistake of law that word was omitted, and that it can be supplied now by this court; and if you do supply it, that the title passes from Stephen Clayton to Alfred Clayton and to Mr. W. T. O'Dell, and that Mr. O'Dell has it now; and that, therefore, the plaintiff cannot recover. Now the defendants say it (word 'heirs') was omitted by a mistake of law. You remember testimony was put up on that subject as to the circumstances attending the parties at the time of the execution of the instrument and all that, all of the time intending to show that it was a mistake of law that that word 'heirs' was not inserted in that deed. Ignorance of law and mistake of law are very different. The same rule as to ignorance of the law in criminal cases applies as well in civil actions. He is bound, notwithstanding his ignorance. He is sometimes bound when he makes a mistake of law, but not always; and right there comes the clear cut distinction between ignorance of the law and the mistake from which the Court of Equity will relieve him. Now the courts have decided that a man may take up a statute and study it, and then make a mistake. It is the same way with a written instrument; if a man takes a deed or a will and reads it, and studies it, and acts upon it—assumed responsibility on what it means—and it turns out that his construction is erroneous, he is bound still, although it is a mistake of law. Now, on the other hand, where two parties attempt to effectu-

ate an agreement, the agreement is understood between them, and they undertake to put it in writing, and it turns out that all of the requirements of law are not complied with, and those facts are made to appear to a jury, they would be relieved on account of that mistake.    Now, in the instance supposed, it is a lawful undertaking, and they undertook to carry it out and to put the terms of the agreement in writing; but it turns out that they have not done so, and when these facts are brought to the attention of the jury and a judge in chancery, they will be relieved of that difficulty.   *   *   *   Now, was that word 'heirs' omitted from that deed by ignorance of law?   If it was, the deed must stand, according to its import, as written. ˙ If that word 'heirs' was left out there through ignorance of the law, or through an erroneous conclusion upon the part of Stephen Clayton and Alfred Clayton as to what the law was, then that deed would cease to operate at the death of Alfred Clayton, and the fee would pass to Stephen Clayton and the heirs interested in this action.   If there was an understanding between Stephen Clayton and Alfred Clayton, that Alfred Clayton was to have a fee simple [title] to that land, and a draughtsman was brought in and it was put in writing, each meaning that he should have it (the fee simple title), and the proper word was 'omitted by mistake, then that mistake could be corrected, and the finding would be in favor of Mr. O'Dell.   Now, gentlemen, all of these legal principles that I have given you, you will consider, and apply the facts that you have heard to these legal principles I have given you."

Reduced to its analysis, the request of the plaintiffs we are now considering imputes error to the Circuit Judge for not having given to the jury his opinion of the sufficiency of the testimony.   This course on the part of the Circuit Judge would have been an unconstitutional invasion of the powers of the jury.   If the plaintiffs had desired a charge from the trial judge upon a hypothetical state of facts, they should have so framed their request.   We are obliged, as was the Circuit Judge, to treat it in the form presented by the plaintiffs in their request to charge.   We do not mean that such request

should be treated literally, but its form and substance should be regarded. We must overrule this exception.

The seventh ground of appeal is as follows: "Because his honor, the Circuit Judge, erred in refusing to charge the fifth request of the plaintiff, which is as follows: 'That in this State the distinction between ignorance of law and mistake of law is sharply and distinctly drawn. Ignorance of law is passive, does not reason, does not know. Mistake of law presumes to know, when in fact it does not. Ignorance of the use of apt and proper terms, as, for instance, the word 'heirs,' to convey in fee, is not a mistake.'" The quotation from the general charge of the Circuit Judge evidences his exceeding care that the jury should understand the terms "ignorance of the law" and "mistake of law." The science of metaphysics undertakes to discuss ignorance as a term, and to ascribe to it certain qualities, as being passive, void of reasoning and also of knowledge. We doubt, however, that a Circuit Judge can be said to have failed in his duty to the jury in this instance by steering clear of these abstractions, and preferring to be guided in his charge to the jury of practical business men by those illustrations of ignorance of law that would be readily apprehended by them. And the plaintiffs having elected to group these metaphysical subtleties with a sound proposition of law as that embodied in the last sentence of the request, must take the consequences of their temerity. Under the rule, this court cannot undertake to divide what was submitted by the appellants to the judge as an entirety. This exception must be overruled.

Appellants in their last ground of appeal, the eighth, allege: "That all the testimony upon the question whether it was a mistake or ignorance of law in omitting the use of the word 'heirs' was offered by the defendants. Assuming, as the fourth request to charge does, that this testimony was true and undisputed, it was the duty of the Circuit Judge to say to the jury that such testimony defines the term ignorance of law, and it was error to leave to the jury the decision of this technical and controlling question of law." The testimony of W. W. Clayton was as follows: "At the time the deed

was to be signed, Bayless [J. Bayless Clayton] had a will there, and he wanted my father to sign the will, and he said that he would not do it, that he would not make a will; that if he did so, some of them might get dissatisfied about it, and that lawyers would break it—that wills were very often broke, and he said that what he wanted to give his children he wanted them to have it; that he allowed to give his property away, so that he would have nothing at his death to have a sale on, and that he would make the deeds to the children before his death, and then nothing could be taken away from his children, after his death, and that there would not be any sale after his death for a division of his property; and he would make deeds or gifts so that the lawyers could not take it away from them, and he did sign the deed then.'' The deed in question is in the handwriting of J. Bayless Clayton. It was further testified that Stephen Clayton declared that it was his purpose to give his lands to his sons and his negro slaves to his daughters; that he never gave his sons any of his negro slaves, but did give some to each of his daughters.

The matter which was the subject of defendant's effort in his proof, and the law he sought to apply thereto, was this: that it was the understanding of Stephen Clayton and A. T. Clayton that he could convey by deed an absolute estate in the lands over which this contention is now made to the said A. T. Clayton. It was not contended that there was any ignorance of the law that a deed to convey a fee simple title to lands should use the word "heirs;" nor was it contended that A. T. Clayton inferred, as a conclusion of his own mind from the terms actually used in the deed made to him by his father, Stephen Clayton, that such a deed by the terms therein employed, that his title thereunder was one in fee simple. In reading the charge of the Circuit Judge, it is very evident that he brought himself in his charge to the jury to dissect this proposition of law, of which his language proved very plainly he had a very clear conception. The principle upon which courts enforce a reformation of an instrument is that preceding the execution of the instrument, and as the inducement to its execution, the parties to the same had an understanding, an agreement, a contract,

and in the effort to reduce the evidence in writing of that contract, a mutual mistake was made, by which mistake so made, the understanding, the agreement, the contract of the parties in relation to the subject matter thereof, was not carried into effect. There is no ignorance of law in such a contingency. The parties knew what they wished to have done, and had agreed that it should be done; the mistake occurred in the preparation of the instrument which was intended to embody that agreement, understanding, contract.

It is perfectly competent in law, that this mistake may be established by parol proof, as well as by contemporaneous writings. It is necessary that the proof of the mistake should be clearly made out by the testimony adduced. In the language of Judge Wallace to the jury on this point: "You can see very well, gentlemen, that the proof must be very clear, in order to authorize a jury to correct a solemn instrument. There is no doubt about that. It is not light, flimsy, doubtful proof, but the jury must be satisfied by clear, competent testimony, that a mistake has not only been made, but is of the nature against which a court of equity would relieve." It is observed that no exception is taken to that part of the charge, which is devoted by the Circuit Judge to explaining and laying down the law on this subject; the appellants have contented themselves to rest their attack upon the judge's charge to the matters set out in their requests to charge. We might, therefore, stop here, but we will briefly notice some authorities on this subject.

Mr. Pomeroy, in his work on Equity Jurisprudence, section 843, thus states this principle of law: "The first instance I shall mention is closely connected with the doctrine stated in the last paragraph but one. It was there shown *that if an agreement was what it was intended to be,* equity would not interfere with it, because the parties had mistaken its legal import and effect. If, on the other hand, after making an agreement, in the process of reducing it to a written form, the instrument, *by means of a mistake in law,* fails to express the contract which the parties actually entered into, equity will interfere with the appropriate relief, either by way of defence to its enforcement, or by

cancellation, or by reformation, to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import of the *contract actually made;* but the mistake of law prevents the real contract from being embodied in the written instrument. In short, if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing. Among the ordinary examples of such errors are those as to the legal effect of a description of the subject matter, and as to the import of technical words and phrases, but the rule is not confined to these instances."

The learned author cites a number of authorities in support of these propositions, among which is the case of *Hunt* v. *Rousmanier*, 8 Wheat., 174; 1 Peters, 1, where Mr. Justice Washington, in delivering the opinion of the Supreme Court of the United States, said: "There are certain principles of equity applicable to this question which, as general principles, we hold to be incontrovertible. The first is, that when an instrument is drawn and executed which professes, or is intended, to carry into execution an agreement, whether in writing or by parol, previously entered into, but which by the mistake of the draftsman, either as to fact or law, does not fulfill, or which violates, the manifest intention of the parties to the agreement, equity will correct the mistake so as to produce a conformity of the instrument to the agreement. The reason is obvious. The execution of agreements fairly and legally entered into is one of the peculiar branches of equity jurisdiction; and if the instrument which is intended to execute the agreement be, from any cause, insufficient for that purpose, the agreement remains as much unexecuted as if the parties had refused altogether to comply with his engagement; and a court of equity will, in the exercise of its acknowledged jurisdiction, afford relief in the one case as well as in the other, by compelling the delinquent party fully to perform his agreement according to

3—44

the terms of it, and to the manifest intention of the parties. So if the mistake exist, not in the instrument, which is intended to give effect to the agreement, but in the agreement itself, and is clearly proved to have been the result of ignorance of some material fact, a court of equity will in general grant relief according to the nature of the case in which it is sought."

The two cases from our own reports, *Lowndes* v. *Chisolm*, 2 McC. Ch., 255, and *Lawrence* v. *Beaubien*, 2 Bail., 623, are authorities of no uncertain character on this question—especially as these cases were decided, the latter especially, after a most learned review of the authorities bearing upon this subject, and also because afterwards, in *Executors of Hopkins* v. *Mazyck and others*, 1 Hill Ch., 250, the court reaffirmed these cases, in which latter case Chancellor Johnson, as the organ of the court, speaking of the two cases just cited, said: "We concur with the chancellor that the trust deed executed by Paul Ravenel Mazyck is good and must stand; and, therefore, that the decree of the Circuit Court should be affirmed; and that would be sufficient for the case itself, but the observations of the chancellor are calculated to shake the rule in *Lawrence* v. *Beaubien*, and *Lowndes* v. *Chisolm*, and the court thought it necessary to use the occasion to express their adherence to it. *Lawrence* v. *Beaubien* was decided upon much consideration, and the more I have reflected upon it since, the more I am confirmed in its correctness; and I feel persuaded that all doubts about it proceed from misapprehension of the principle on which it is founded. There is, as I understand it, a very obvious distinction between ignorance and mistake of law. Ignorance cannot be proved (who can enter into the heart of man and ascertain how much knowledge dwells there?) and for that reason the courts cannot relieve against it; but not so as to a mistake of law. That is sometimes susceptible of proof. * * * Mistakes as to matters of fact have always been regarded as retrievable upon clear, full and irrefragible proof, and mistakes in law ought to be upon the same footing, when the proof is equally certain."

Now, what were the doctrines of the cases of *Lowndes* v. *Chisolm, supra*, and *Lawrence* v. *Beaubien, supra?* In the first it

was announced: "But it is well established that relief is given in cases where the mistake has been one clearly of law. And the authorities relied on put the matter beyond all doubt, if, indeed, it could be doubted at this day." In the latter, Chancellor Johnson, as the organ of the court, says: "The question then arises whether this contract can be enforced against him; or, to put it abstractly, whether one is bound by a contract entered into under a mistaken deduction of law from facts which were known to him, by which he acquired nothing, and the party contracted with parted with no right nor suffered any loss." It has been in the case cited urged that to uphold the right to correct a mistake in law controverted the maxim *"ignorantia juris non excusat."* Replying to this suggestion, the learned chancellor said: "The propriety and necessity of its application, as the means of enforcing the obligation of contracts, is, to my mind, an utter perversion of the use for which it was designed, for that is sufficiently attained by other rules, of equal obligation, framed for the express purpose. Amongst these, that which has the strongest analogy to that contained in the maxim, is that which provides that no one shall aver against his own deed, but that is founded on a very different principle. The uncertainty of contracts, and the temptation to perjury, incident to the substitution of facts depending on slippery memory, for those reduced to writing, are the foundations of this rule; and it would seem to furnish itself a sufficient security against all abuses, without the aid of *ignorantia juris non excusat.* And yet this rule, while it is imperative in the interpretation of contracts, is made to promote the great ends of justice by letting in proof that the most solemn contract was obtained by fraud or duress, or other corrupt and illegal means; and I am utterly unable to conceive of any solid foundation for the exclusion of proof that the consideration was founded in a mistake of law. All the difficulty and confusion which has grown out of the application of the maxim appear to me to have originated in confounding the terms *ignorance* and *mistake.* The former is passive, and does not presume to reason, and unless we were permitted to dive into the secret recesses of the heart, its presence is incapable of proof; but the

latter presumes to know, when it does not, and supplies palpable evidence of its existence. Hence it is well remarked by Lord Rosslyn, in *Fletcher* v. *Tollet*, 5 Ves., 14, that 'ignorance is not mistake.' "

It has been supposed that the cases of *Keitt* v. *Andrews*, 4 Rich. Eq., 349; *Cunningham* v. *Cunningham*, 20 S. C., 317, and *Roundtree* v. *Roundtree*, 26 *Id.*, 450, have seriously interfered with the cases previously decided by the court of last resort in this State, and have thus caused our State's decisions to be at variance not only with themselves but as well with other American States. We will examine these cases, to see if this be true. Fundamental to the inquiry of what is decided in any given case, must always be the ascertainment of what the court was called upon to decide; for it is only when the decision is responsive to the case, that it is entitled to be regarded as an authority binding on others; it being no part of the duty, under the law, for courts to formulate law. Under the theory of the States of the union of States, the duty of formulating the law belongs to another co-ordinate branch of government, so far as State laws are concerned.

In *Keitt* v. *Andrews, supra*, the facts were these, substantially: The will of Daniel Hess gave his property to his daughter and grand-children. At the time of his death he had only two grand-children. Years afterwards, in accordance with a settlement sheet prepared by the ordinary of Orangeburg County, without any distinction as to the manner in which such settlement sheet should be made by the personal representatives of the said Daniel Hess, deceased, the said ordinary, under his construction of the will that all *five* grand-children were entitled to a share thereof, prepared receipts for an equal share therein of each of said grand-children, which receipts were signed by each grand-child, and his or her share was duly paid over. Ten years afterwards, in one case, and eight years afterwards, in the other, two grand-children, who were *in esse* at the date of the testator's death, filed bills in equity, seeking thereunder to cancel the settlements and have the whole estate paid to them, thus excluding the other three grand-children. The court refused to do so on the grounds that while it was

true that the two complainants, under our law, were entitled to the whole estate, yet (1) that inasmuch as the executor and legatee honestly misconstrued the will and had a settlement in full, based upon such misconstruction, the settlement will not be opened merely because of such misconstruction; and (2) the parties desiring the opening of the settlement on the grounds of mistake or error had waited too long in this instance; parties desiring such a course must make haste in their application to the courts therefor—long acquiescence amounts to a presumed ratification. One of the discharges of the executor was under seal, while the other, though in writing, was not under seal.

"The ground," says the chancellor, "on which the complainants claim to be relieved is simply ignorance of the law; or, in other words, ignorance of the true legal construction of the will. But ignorance of the law does not entitle one to open a settlement formally and solemnly made. * * * Is there any authority which goes so far as to say that a party is entitled to relief from a mistake of the law, where there is no fraud, misrepresentation, management or undue influence, *and* where the mistake was simply his own erroneous construction of a will or deed? In this case the parties seeking relief had the will before them. They were familiar with its provisions. The defendants did not seek in any way to impose their construction of it upon the complainant. It does not appear that they expressed any opinion as to its proper construction. If the parties now complaining, possessed as they were of all the facts of the case, and with the will before them, had applied to the proper sources of information, and had sought legal counsel, they would have been advised as to the true construction of the will. * * * Their not pursuing this course was *laches* on their part, against the consequences of which the court is not bound to protect them. * * * A misconstruction like that made out in this case, is rather an error of the judgment than a mistake either of the law or of fact. *The simple misconstruction of a will or deed, where there is no fraud or circumvention, cannot be regarded in any point of view as coming within the scope and authority of those cases where mistakes at law, in con-*

*tradistinction to ignorance of law, have been considered as affording grounds for relief.*"

These last words, which we have italicized, show plainly enough that the learned chancellor, whose Circuit decree was adopted by the Court of Appeals without any words of explanation or comment, recognized the existence of the very distinction that Judge Wallace made in his charge to the jury, that not *all* mistakes of law are retrievable in a Court of Equity, and that there is a distinction between mistakes of law and ignorance of law. If the chancellor or Court of Appeals had deemed, after a careful review of the law, that the cases of *Lowndes* v. *Chisolm* and *Lawrence* v. *Beaubien, supra*, were at variance with their conclusion here reached, they would have said so, and the whole case is entirely free from any reference to the result.

The case of *Cunningham* v. *Cunningham, supra*, is where Miss Cunningham, with her father's will before herself and brothers, executed interchangeable deeds to some of the real estate controlled by the provisions of their father's will. Years afterwards her devisee sought to have such deeds reformed, so that the purpose of the will in question might be preserved, on the ground that his testatrix, Miss Cunningham, had misconstrued those provisions of her father's will. But the court, on the authority of *Keitt* v. *Andrews, supra*, denied this application for a reformation—Judge Fraser, of the Circuit Bench, sitting in the place of Chief Justice Simpson, who was disqualified to preside because of having been counsel to one of the parties while at the bar, in delivering the opinion of this court, did say: "The case before the court does not call for any attempt to define the rule by which relief can be granted on account of mistake of law. * * * In this State, however, the distinction has been sharply drawn between ignorance of law and mistake of law in *Lawrence* v. *Beaubien*, 2 Bail., 623, and *Lowndes* v. *Chisolm*, 2 McCord Ch., 455, the court holding that in cases of mistake, the court could give relief, and that it would be refused in cases of mere ignorance, the principal reason given being that mistake could be proved and that ignorance could not. As the parties can now testify in their own behalf, *it may be* doubtful if the reason can be longer sufficient to justify

the distinction [italics ours].   In *Hopkins* v. *Mazyck*, the Court of Appeals, in affirming the Circuit decree, takes occasion to put its judgment on another ground, and to reaffirm the doctrine in *Lawrence* v. *Beaubien* and *Lowndes* v. *Chisolm*, on which the chancellor had cast some doubts in the Circuit decree. The court, however, has never held that even a mistake in law stands in all cases on the same footing as a mistake of fact. And nowhere have any limitations been laid down capable of general application."

And then the learned judge quotes the language of Chancellor Dargan, used in *Keitt* v. *Andrews, supra*, that already appear herein, as to the fact that misconstruction of wills or deeds, where there is no fraud or circumvention, do not fall within the scope of the law regulating mistakes of law, by which such mistakes can be corrected.   He then says: "In this view, this court concurs ,and holds that even if there is a difference as to ignorance of law and mistake of law, and it should be regarded as in fact true that Pamela Cunningham had formed an opinion either from her own construction of this will or in consequence of erroneous advice of others, this is no ground on which this court can relieve her devisees from the effect of those solemn deeds executed in 1875."   It will be seen, that all that this court has done, is to express a doubt as to whether the distinction between mistake of law and ignorance of law still subsist, now that parties are allowed to testify on their own behalf. And in no form is it asserted that there are not cases of mistakes in law from which equity will relieve.   It may be doubted if the fact that parties can now testify in their own behalf, is a very potent reason for *the doubt* expressed by the learned judge.

As to the case of *Roundtree* v. *Roundtree, supra*.   In this case the testator had made his will some time before his death. During his last illness, his son, James, died, and for prudential reasons, the news of his death was kept from the sick father, who, however, learned this fact just before his death, but no alteration of his will was made.   By the terms of this will, the children of James were unprovided for.   This first seemed not to have been known by the testator's other children, and accordingly, when testator's general estate was distributed,

the children of James were given a child's share between them. After a life estate terminated, and thereby released a tract of land for division among testator's children, the question was sprung, that James' children were not entitled to a share. This was stoutly contested by them, and they insisted that they were entitled to have the will reformed, so that they might receive their father's (James') share. The Circuit Court sustained their contention, but this court, on appeal, held that this was error. Mr. Justice McIver, in delivering the opinion of the court, amongst other things, said: "Again, it is urged that the children of James W. Roundtree should be let in on the ground of mistake. It is not necessary for us to consider whether the Court of Equity has jurisdiction to correct mistakes in wills, and if so, in what cases, for we do not think any mistake was presented. It is true that James W. Roundtree was alive at the time of the execution of the will, and was one of the objects of the intended bounty of the testator, but it does not necessarily follow that his children were, certainly not that they were equal, objects of his bounty. * * * The Circuit Judge seems to assume, but upon what evidence, if any, the record does not disclose, that the testator was kept in ignorance of his (James') death, until so near his own that it was probably impossible to alter his will. Now, even accepting the assumption as well founded, it certainly does not show a case of mistake, but rather that of misfortune or omission. Can any one venture to say what the testator desired to do with the interest he had intended for his dead son, and which he could not take by reason of his death? If the court should undertake to do so, would not that be a clear case of undertaking to *make* instead of construing the will of the testator?"

The present chief justice then proceeds to suggest that the provision of the act of 1789 might have reached the case of the testator, and he may have concluded that under this act the children of James W. would not take the provision in the will made for the said James W. And then he says: "But even if this were so, this clearly was not such a mistake of law as the court would relieve from (if, indeed, there is now any case in which relief would be granted upon that ground, *Cunningham*

v. *Cunningham*, 20 S. C., 317); for it was nothing more than an erroneous construction of a statute (*Pratt* v. *McGhee*, 17 S. C., 428), which certainly affords no ground of relief." Again we observe the expression of a doubt as to the existence of any mistake in law which is relievable, but with this expression of doubt, parenthetically expressed at that, it is evident the [present] chief justice did not desire to be understood as so ruling.

In *Munro* v. *Long*, 35 S. C., 354, it is said the distinction between ignorance of law and mistake of law is "*nice and shadowy.*" And in *Smith* v. *Winn*, 38 S. C., 192, Chief Justice McIver, in speaking of the mistake made in the construction of a will, says: "It is very obvious from the cases of *Keitt* v. *Andrews*, *supra*, and *Cunningham* v. *Cunningham*, that such a so-called 'mistake' would not be sufficient;" and in this same case, in the dissenting opinion of Justice Pope, it is said: "While it is true that this court cannot view with approval any appeal that is based upon an error of fact or of law in the construction of a will, when there is no fraud or circumvention, parties to a controversy or their privies may have made. * * *"

It must be evident in looking to the text of these decisions that it is nowhere decided that there are not some mistakes a court of equity will relieve against. Furthermore, that all the cases from our own State courts since *Lawrence* v. *Beaubien*, *supra*, have dealt with mistakes made by parties in the construction of wills. They, not one of them, pretend to cover a case similar to the case now on appeal. Here in the case at bar the contention is strictly confined to this: when a grantor and grantee have made an agreement as to a conveyance of land, and a mistake of the scrivener converts the deed executed to carry out the previous agreement from one in fee simple to one conveying only a life estate, and these facts are made clearly to appear, is it relievable, so that when the heirs at law of the grantor seek to take away the land from the grantee, because of the terms in their grantor's deed, that the grantee may show this mistake? We think it is in this case. Before closing this discussion, we would desire to call attention to the cases of deeds in fee simple absolute on their faces. Now, when the grantors come into a court of equity and allege and prove that,

notwithstanding by the terms of the deed an estate in fee simple is granted to the grantee, yet such an instrument was made really to secure the grantee in the loan of money to the grantor by a pledge of the land named in the deed, this is allowed. It may be said that this is done because it is competent to prove the consideration of a deed. This is true, but it is not after all because there was an agreement between the parties for the loan of money and not an absolute sale of land, and, therefore, the deed prepared as a conveyance should have been a mortgage.

So far as the effort of the appellant is concerned, where they seek to inject the question as to this being a voluntary deed, and, therefore, not reformable, we have looked in vain in the "Case" to find any place where these appellants raised such a question before the Circuit Judge, and it is too late to ask that this question be considered by this court.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE GARY concurred.

MR. CHIEF JUSTICE MCIVER, *dissenting.* Being unable to concur in the conclusion reached by Mr. Justice Pope, I propose to state briefly, without elaborating the argument, the grounds of my dissent. It seems to me that the first and third grounds of appeal impute error to the Circuit Judge in receiving parol evidence to vary the terms of the deed from Stephen Clayton to his son, A. T. Clayton. The manifest object of this testimony was to correct an alleged mistake in that deed by supplying the word "heirs," not found in the deed, so as to convert that conveyance from a deed conveying a life estate only into a deed conveying the fee. There is no doubt that, as as a general rule, parol evidence is not competent to vary the terms of a deed or other written instrument; but to this general rule certain exceptions are recognized. As is said in 2 Pom. Eq. Jur., § 858: "It is an elementary doctrine that parol evidence is not, in general, admissible between the parties to vary a written instrument. * * * It is equally well settled that mistake, fraud, surprise, and accident furnish exceptions to this otherwise universal doctrine." Here the defendant is seeking the benefit of

this exception to the general rule of evidence for the purpose of obtaining equitable relief from an alleged mistake in the terms of the deed, under which he claims to hold the land in controversy; and before he can obtain the benefit of this exception to the general rule of evidence, it must appear that the case in which such exception is sought to be applied, is a case in which he would be entitled to the equitable relief demanded.

I do not think this is such a case, for the following reasons: 1st. The deed sought to be reformed is a purely voluntary conveyance. It so appears upon its face, and there is no testimony to the contrary; and, therefore, it is not such an instrument as a court of equity would undertake to reform. In 15 Am. & Eng. Enc. Law, 678, the rule is laid down in the following language: "It is a well settled principle of equity that a deed that is purely voluntary, resting on no consideration whatever, cannot be reformed for mistake," and quite a number of cases are cited in the notes to sustain that proposition. Amongst the cases there cited is one very much like the case now under consideration. That is the case of *Powell* v. *Morisey*, 98 N. C., 426, originally reported in 4 S. E. Rep., 185. In that case a grand-father had conveyed the land in question to his grand-son by a deed, the terms of which passed only the life estate, and the grand-son claimed that the word "heirs" was omitted through the inadvertence of the draughtsman. Held that the deed being voluntary, could not be reformed. To same effect see 1 Story Eq. Jur., § 176; 2 *Id.*, § 793a. The doctrine thus laid down in that valuable encyclopedia, besides being sustained by the authorities there cited, has also the support of reason. For, as I understand it, the theory upon which a court of equity proceeds in affording relief from a mistake is that there was a precedent agreement, the terms of which are imperfectly or inaccurately incorporated in the written instrument sought to be reformed; and equity looking behind such written instrument, will require the specific performance of such precedent agreement by reforming the written instrument in accordance with the terms of such agreement. In other words, a court of equity in both cases proceeds upon the same principle; and the rule is undoubtedly well settled that a court of equity will not decree

the specific performance of a purely voluntary agreement, even though under seal. See the sections above cited from Story Eq. Jur., 3 Pom. Eq. Jur., §§ 293, 1405; Fry on Spec. Perf., § 64; 22 Am. & Eng. Enc. Law, 1030.

2d. In the second place, I do not think that the mistake, if there was one, was such as to warrant the interposition of a court of equity. If there was any mistake at all, it was in supposing that the deed as drawn would convey the fee, for there is not the slightest evidence tending to show that the word "heirs" was omitted through inadvertence or accident. To use the language of Wardlaw, Ch., in *Dennis* v. *Dennis*, 4 Rich. Eq., 307, a case which, in principle, is very much like the case now before the court: "In the case before us, the parties were probably ignorant of the effect of the terms of limitation employed by them, but there is no proof of mistake. No word was inserted in the deed, nor omitted from it, not intentionally inserted or omitted." And we might add, in the language used by the same chancellor in his Circuit decree in that case, which was affirmed by the Court of Appeals: "It is probable that all concerned in the concoction and execution of the deed mistook the legal effect of the words of limitation employed, but it was a mistake arising altogether from overweening conceit of themselves, or rash neglect in advising with the skillful. Those who will ignorantly and rashly employ technical terms of the law, must submit to the consequence of having the terms technically construed. If relief be afforded in this case, the court must undertake to correct all the miscarriages of audacious ignorance in conveyancing." To the same effect, see *Ryan* v. *Goodwyn*, McMull. Eq., 452, where the court declined to afford relief in a case where, although the manifest intention was to convey property to a married woman's sole and separate use, so as to protect it from the creditors of her improvident husband, yet, under the terms used in the deeds, she was invested with such an estate as that her husband's marital rights attached, and the property was held liable for the claims of his creditors. So in case of *Westbrook* v. *Harbeson*, 2 McCord Ch., 112, where a married woman joined with her husband in the conveyance of her estate of inheritance, and undoubtedly intended to release

her inheritance, but, through the ignorance of the magistrate, she only released her right of dower, and the court declined to give relief. See, also, the case of *Keitt* v. *Andrews*, 4 Rich. Eq., 349, recognized and followed in *Munro* v. *Long*, 35 S. C., 354, where the court declined to give relief from an alleged mistake in the construction of a will.

See, also, the famous case of *Hunt* v. *Rousmanier*, 1 Peters, 1. In that case a borrower of money proposed to secure the lender by either of three modes—a mortgage on his vessel, a bill of sale of the vessel, or an irrevocable power to sell. The lender selected the latter, and although there was no doubt of the intention of both parties to have the loan adequately secured, yet the court declined to give relief when the security proved unavailing by reason of the death of the borrower before the maturity of the debt, which, as matter of law, operated as a revocation of the power of sale, although it was contended that the lender acted under a mistaken belief that the power of sale was irrevocable, and that he should be relieved from the consequences of such mistake. In that case, it was undoubtedly the intention of the parties, the one to give and the other to obtain adequate security for the repayment of the money loaned; yet as the mistake was due to an erroneous construction of the legal effect of the instrument which was adopted to carry out the intention, relief was denied, although the lender acted under the advice of counsel, which proved to be erroneous, that the power to sell was irrevocable. So in this case, even if it should be conceded that the evidence was sufficient to show that the parties intended a deed which would convey a fee simple, yet as their mistake was in putting an erroneous construction upon the legal effect of the deed, which was, in fact, executed, relief must be denied upon the same ground as in the case last cited. As is said in 2 Pom. Eq. Jur., § 843: "The rule is well settled, that a simple mistake by a party as to the legal effect of an agreement which he executed, or as to the legal result of an act which he performs, is no ground for either defensive or affirmative relief. If there were no elements of fraud, concealment, misrepresentation, undue influence, violation of confidence reposed, or of other inequitable conduct in the transaction,

the party who knew, or had an opportunity to know, the con-
tents of an agreement or other instrument, cannot defeat its
performance or obtain its cancellation or reformation, because
he mistook the legal meaning and effect of the whole or any of
its provisions."

Again, I think the Circuit Judge erred in leaving the ques-
tion to the jury, whether the testimony in the case showed ig-
norance of law or a mistake of law; and in refusing to charge
as requested by plaintiff's fourth and fifth request, and hence,
that the sixth, seventh, and eighth grounds of appeal should
be sustained. The defence of mistake was an equitable defence,
and the issue thereby presented was an issue to be tried by the
court, and not by the jury. For, while it is entirely true that
an equitable defence may be pleaded to an action at law, either
jointly with other legal defences or separately, yet care must
be taken to have the issues thus presented, tried by their ap-
propriate tribunals. *Adickes* v. *Lowry*, 12 S. C., 97. From
what has been already said, it seems to me that the judge erred
·in refusing plaintiff's fourth and fifth requests.

I think, therefore, that the judgment of the Circuit Court
should be reversed, and the case remanded for a new trial.

Judgment affirmed.